13-4736-cv
*In re Roman Catholic Diocese of Albany, New York, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term, 2013

(Submitted: January 14, 2014      Decided: February 7, 2014)

Docket No. 13-4736-cv

———————

In re ROMAN CATHOLIC DIOCESE of ALBANY, NEW YORK, INC.

Michael SHOVAH,

*Plaintiff-Respondent,*

-v.-

ROMAN CATHOLIC DIOCESE of ALBANY, NEW YORK, INC.,

*Defendant-Petitioner,*

Fr. Gary MERCURE,

*Defendant-Respondent.*[*]

———————

Before:

WINTER, WESLEY, AND CHIN, *Circuit Judges.*

———————

[*] The Clerk of the Court is directed to amend the caption as noted above.

1

Defendant-Petitioner, the Roman Catholic Diocese of Albany, New York, petitions this Court for a writ of mandamus directing the United States District Court for the District of Vermont (William Sessions, III, *Judge*) to dismiss the case against it for lack of personal jurisdiction. The district court found the Diocese "at home" in Vermont, and therefore subject to general jurisdiction in that state, based on occasional worship services held there by a small number of priests associated with the Diocese and other limited contacts. The district court's jurisdictional analysis is clearly erroneous. Subjecting the Diocese to suit and the resultant foray into sensitive documents—investigations into allegations of sexual abuse by its employees—when the case would be time-barred if brought in New York (likely the only state with jurisdiction) constitutes "exceptional circumstances" warranting the "extraordinary remedy" of a writ of mandamus. A writ of mandamus is the only "adequate means" for the Diocese to prevent that irreparable harm. The clarity of the district court's error, taken together with the substantial confidentiality interests at stake (which are amplified by the fact that the case against the Diocese is unlikely to ultimately proceed to trial in any forum), establish that the Diocese has a "clear and indisputable" right to the writ.

Accordingly, we GRANT the Diocese's petition for a writ of mandamus, VACATE the September 3, 2013 order of the district court, and instruct the district court to grant the Diocese's motion to dismiss the claims against it for lack of personal jurisdiction.

---

MICHAEL L. COSTELLO, Tobin and Dempf LLP, Albany, NY (Meir Feder, Jones Day, New York, NY; Thomas E. McCormick, McCormick, Fitzpatrick, Kasper & Burchard, P.C., Burlington, VT, *on the brief*), *for Defendant-Petitioner*.

JEROME F. O'NEILL, O'Neill Kellner & Green, P.C., Burlington, VT, *for Plaintiff-Respondent*.

SHANNON BERTRAND, Kenlan, Schwiebert, Facey & Goss, P.C., Rutland, VT, *for Plaintiff-Respondent.*

PER CURIAM:

Michael Shovah filed suit in the United States District Court for the District of Vermont against the Diocese and its former priest, Gary Mercure, alleging that Mercure transported Shovah (when he was a minor sometime in the late 1980s[2]) from New York to Vermont for the purpose of sexually abusing him, and did sexually abuse him. Shovah asserted only general (not specific) jurisdiction over the Diocese: the Diocese's alleged wrongs—breach of fiduciary duty to Shovah by permitting Mercure to hold himself out as a Roman Catholic priest and negligent supervision of Mercure—did not arise from its contacts with Vermont.

The Diocese is a New York special act corporation with its principal office in Albany, New York. It covers fourteen counties in New York, and does not own

---

[2] The district court acknowledged that "Shovah does not state when the purported sexual abuse occurred; rather, the Diocese states that the purported sexual abuse occurred during the late 1980[]s, a statement Shovah has not disputed." *Shovah v. Mercure*, 879 F. Supp. 2d 416, 419 n.1 (D. Vt. 2012). An affidavit by a Diocese priest, Michael A. Farano, also states: "plaintiff's counsel in this action has informed counsel for the [D]iocese that the Vermont incident referenced in the complaint took place in either 1986 or 1987."

real property, maintain an office, or have any financial accounts in Vermont. Each parish in the Diocese constitutes a separate religious corporation that owns its real property, establishes its own operating budget, hires and supervises its own employees, and relies on its own parishioners for charitable contributions. From 2002 through 2012, six of the Diocese's more than 100 parishes were located near the Vermont border, and served a total of 78 parishioners who resided in Vermont; those parishioners constitute 2.2% of the six parishes' combined registered parishioners. From 2002 through 2012, the six border parishes employed 18 Vermont residents, used a total of 21 Vermont vendors (in contrast to the 698 non-Vermont vendors), and accepted advertisements from eleven Vermont merchants (including a barber shop, a pizza parlor, a chiropractor, a law firm, and a funeral home) for publication in church materials.

During those ten years, the Diocese's weekly newspaper, *The Evangelist*, had a weekly circulation of 46,224; forty of those subscribers were Vermont residents. During the same period, the Diocese received .080% (or $56,305) of its more than $67 million in philanthropic gifts from Vermonters. Twelve Vermont students enrolled in Diocesan schools.

4

Between 2002 and 2012, at least thirteen of the Diocese's approximately 200 priests conducted a combined total of sixteen services of worship in Vermont. In addition, from July 2002 to February 2009, the Diocese authorized Father Zelker, a New York priest, to celebrate Sunday morning mass at a Vermont church. Father Zelker neither served nor was ever designated as a pastor of the Vermont church.

Following jurisdictional discovery, the Diocese moved to dismiss the action for want of personal jurisdiction. In opposition, Shovah pressed a jurisdictional predicate based on "Diocesan employees working and living in Vermont, Diocesan publications [being] sent to Vermont residents[,] . . . [Diocese parishes] accepting advertising from Vermont vendors, and Diocesan parishioners, students and contributors residing in Vermont."

The district court denied the Diocese's motion to dismiss. Although the court acknowledged that the Diocese "maintains no financial or physical foothold in the state," and that its "direct contacts with the state . . . have been limited," it concluded that Father Zelker's weekly masses that ended in 2009 and the sixteen services of worship conducted by thirteen Diocese priests over a ten-year period were imputable to the Diocese and together were "sufficiently continuous and systematic to render the Diocese at home in Vermont." *Shovah v. Mercure*, 2:11-

5

CV-201, 2013 WL 4736836, *3-4 (D. Vt. Sept. 3, 2013). Based primarily on those two sets of contacts, the court found that Shovah had sufficiently pled jurisdiction and then declined to address whether the parishes' contacts were imputable to the Diocese and could also serve as a jurisdictional basis for the action. *Id*. at *4 n.2.

The court thereafter denied the Diocese's motion for certification of interlocutory appeal under 28 U.S.C. § 1292(b), and ordered the Diocese to, *inter alia*, produce documents, dating back to 1975, reflecting allegations involving sexual abuse of minors by any Diocese employees, and the details of any resulting investigations. *See Shovah v. Mercure*, 879 F. Supp. 2d 416 (D. Vt. 2012).

The Diocese then filed this petition for a writ of mandamus and moved for expedited consideration of its petition. On December 31, 2013, we granted the Diocese's motion to expedite, and, on January 14, 2014, this panel *sua sponte* stayed all district court proceedings pending consideration of the petition.

**Discussion**

The All Writs Act empowers "all courts established by Act of Congress" to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). A writ of

mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (internal quotation marks omitted). The writ has been used "both at common law and in the federal courts . . . to confine the court against which mandamus is sought to a lawful exercise of its prescribed jurisdiction." *Id.* (alterations and internal quotation marks omitted). We issue the writ only in "exceptional circumstances amounting to a judicial 'usurpation of power' or a 'clear abuse of discretion.'" *Id.* (quoting *Will v. United States*, 389 U.S. 90, 95 (1967) and *Bankers Life & Cas. Co. v. Collins*, 346 U.S. 379, 383 (1953)) ( citations and some internal quotation marks omitted).

Three conditions circumscribe the writ: (1) "the party seeking issuance of the writ must have no other adequate means to attain the relief [it] desires"; (2) "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances"; and (3) the petitioner must demonstrate that the "right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 380-81 (brackets, citations, and internal quotation marks omitted).

Each is satisfied here.

## I. Harm that Cannot Be Prevented By Post-Judgment Relief

The Diocese urges that mandamus is the only means of relief because a post-trial appeal "would do nothing to alleviate the harm . . . of having to litigate claims that should have been dismissed at the outset, or the harm to employees and former employees from the disclosure of highly sensitive personal information." Pet. 14. Thus, the Diocese stresses, discovery will essentially let the "cat out of the bag." *Id.* Mandamus is the only means for the Diocese to obtain the relief it seeks.

First, the Diocese cannot challenge the district court's denial of its motion to dismiss by means of an interlocutory appeal. We have jurisdiction over appeals "from final decisions of the district courts." 28 U.S.C. § 1291. Thus, our jurisdiction ordinarily "depends on the existence of a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (internal quotation marks omitted). And, as relevant here, "denial of a motion to dismiss, even when the motion is based upon jurisdictional grounds, is not immediately reviewable." *Catlin v. United States*, 324 U.S. 229, 236 (1945); *see also Wabtec Corp. v. Faiveley Transp. Malmo AB*, 525 F.3d 135, 137-38 (2d Cir. 2008).

8

Further, the Diocese rightly does not assert that the order is appealable under the collateral order doctrine. To fall within the "'small class' of decisions excepted from the final-judgment rule . . ., the order must [(1)] conclusively determine the disputed question, [(2)] resolve an important issue completely separate from the merits of the action, and [(3)] be effectively unreviewable on appeal from a final judgment." *Coopers*, 437 U.S. at 468 (quoting *Abney v. United States*, 431 U.S. 651, 658 (1977)). Setting aside the first two requirements, the order does not involve "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial," and therefore would be reviewable upon entry of a final judgment. *United States v. Punn*, 737 F.3d 1, 5 (2d Cir. 2013).

Second, even if the order qualified for certification under 28 U.S.C. § 1292(b), the certification decision is entirely a matter of discretion for the district court, and, here, the district court denied the Diocese's certification request.

Finally, an appeal after a final judgment (albeit available) is not, under these circumstances, an "adequate means" for the Diocese to obtain the relief it seeks. "[T]he type of harm that is deemed irreparable for mandamus purposes typically

involves an interest that is both important to and distinct from the resolution of the merits of the case." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 117 (2d Cir. 2013).

We have previously issued a writ of mandamus to prevent the disclosure of confidential reports of undercover New York City police officers protected by the law-enforcement privilege. *See In re The City of New York*, 607 F.3d 923, 934 (2d Cir. 2010). We observed that the petitioning parties had no other adequate means to attain relief because "a remedy after final judgment cannot unsay the confidential information that has been revealed." *Id.* at 934 (internal quotation marks omitted). In other words, timing matters: "Once the 'cat *is* out of the bag,' the right against disclosure cannot later be vindicated." *S.E.C. v. Rajaratnam*, 622 F.3d 159, 170 (2d Cir. 2010) (emphasis in original).

Here, the district court issued an expansive discovery order requiring, *inter alia*, the Diocese to disclose "investigations of child sexual abuse involving the Diocese's employees, including the identifying names and addresses of the investigators and summaries of the oral and written statements taken during the course of the investigation." There is no evidence that this information has previously been disclosed. The cat is still in the bag, and the ensuing litigation will inevitably let it out.

10

Moreover, unlike a run-of-the-mill tort case, this litigation implicates

significant confidentiality interests for the Diocese, its priests, and (more

alarmingly) other victims (and their families) who would likely be subjected to

distressing depositions, revisiting pasts that would not otherwise be revisited in a

case solely against Mercure.  Furthermore, the issue is not one of mere geography;

the only other forum where jurisdiction would likely lie is New York, and, there,

Shovah's claims against the Diocese would be time-barred.

In New York, the statute of limitations applicable to a sexual

abuse/vicarious liability claim is the one-year statute found in C.P.L.R. 215(3), and

the statute of limitations applicable to negligence claims is the three-year statute

found in C.P.L.R. 214(5).  Under New York C.P.L.R. 208, Shovah's claims would

have been tolled until he reached the age of 18.  *See* N.Y. C.P.L.R. 208.  Therefore,

even if Shovah was a newborn in 1987, his claims would have accrued at the latest

in 2008 (twenty-one years later); he, however, did not file his complaint until 2011.

Of course, the district court could reduce any harm by, *inter alia*, limiting

discovery, sealing records, and issuing protective orders; the Diocese could,

likewise, do so through additional mandamus litigation in this Court.  The

prospective harm, however, will result not simply from disclosure, but also from

the invasive inquiries that necessarily precede it (which post-judgment relief would do nothing to cure). While invasiveness and unpleasantness are not reasons to deny discovery, here disclosure would likely serve no purpose. Thus, any corrective measures would only mitigate a harm that should have been, and still can be, avoided altogether.

## II. Mandamus is "Appropriate Under the Circumstances"

Although "the general rule [is] that appellate courts should avoid determining jurisdictional issues on a petition for mandamus," *In re Ivy*, 901 F.2d 7, 10 (2d Cir. 1990), the unique circumstances of this case, as noted above, counsel in favor of immediate review. The district court's personal jurisdiction determination is patently erroneous. Moreover, its misapplication of the personal jurisdiction standard set forth in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011), and recently clarified in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) (decided after the district court's decision), offers an opportunity to reaffirm the contours of general jurisdiction. It is this extraordinary combination—the particularly serious harms preventable only through issuance of a writ of mandamus, the clarity of the district court's error, and the need for guidance from this Court regarding the proper general personal jurisdiction

12

inquiry, particularly as applied to religious and other charitable organizations—that renders this case ripe for mandamus relief.[3]

### III. The Diocese Has a "Clear and Indisputable" Right to the Writ

The district court "clear[ly] and indisputabl[y]" abused its discretion in finding the Diocese "at home" in Vermont.  A district court abuses its discretion if it (1) "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence" or (2) renders "a decision that cannot be located within the range of permissible decisions." *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks omitted).  The district court "indisputabl[y]" employed an "erroneous view of the law" when it denied the Diocese's motion to dismiss; the Diocese has a "clear and indisputable" right to a writ of mandamus. *Cheney*, 542 U.S. at 381.

Personal jurisdiction over a foreign defendant in a federal-question case requires a two-step inquiry.  We first look to the long-arm statute of the forum state. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013).  If jurisdiction lies, "the second step is to analyze whether personal

---

[3] By the same token, this opinion should not be read as inviting mandamus petitions to be filed whenever a party disagrees with a district court's jurisdictional ruling.

13

jurisdiction comports with the Due Process Clause of the United States

Constitution." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir.

2010).

Vermont's long-arm statute, VT. STAT. ANN. tit. 12 § 913(b),[4] reflects "a clear

policy to assert jurisdiction over individual defendants to the full extent permitted

by the Due Process Clause." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d

560, 567 (2d Cir. 1996) (internal quotation marks omitted). We thus look to

"whether the court's exercise of personal jurisdiction over the defendant satisfies

the requirements of due process." *Id.*

In the area of personal jurisdiction, "[t]he canonical opinion . . . remains

*International Shoe* [*Co. v. Washington*], 326 U.S. 310 [(1945)], in which [the Supreme

Court] held that a State may authorize its courts to exercise personal jurisdiction

over an out-of-state defendant if the defendant has 'certain minimum contacts

---

[4] VT. STAT. ANN. tit. 12 § 913(b), the relevant Vermont long-arm statute, provides:

> Upon the service, and if it appears that the contact with the state by the party or the activity in the state by the party or the contact or activity imputable to him is sufficient to support a personal judgment against him, the same proceedings may be had for a personal judgment against him as if the process or pleading had been served on him in the state.

14

with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Goodyear*, 131 S. Ct. at 2853 (quoting *Int'l Shoe*, 326 U.S. at 316)).

There are two types of personal jurisdiction: general and specific. Specific jurisdiction, which Shovah concedes is lacking, "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 2851 (brackets and internal quotation marks omitted). Thus, specific jurisdiction cases are limited to those involving "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.*

By contrast, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (quoting *Int'l Shoe*, 326 U.S. at 317). Because "general jurisdiction is not related to the events giving rise to the suit, . . . courts impose a more stringent minimum contacts test." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013).

15

"*Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler AG*, 134 S. Ct. at 760.  In *Daimler AG*, the Supreme Court further noted that since *International Shoe*, it has "declined to stretch general jurisdiction beyond limits traditionally recognized." *Id.* at 757-58.  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation [even a religious one], it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear*, 131 S. Ct. at 2853-54.

Principal place of business and state of incorporation "have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Daimler AG*, 134 S. Ct. at 760.  For the Diocese, Vermont is neither and New York is both.  The Diocese is a special act corporation with its principal office in Albany, New York; its operations are almost entirely limited to New York; and it does not own any real property, maintain an office, or possess any bank accounts in Vermont.

*Daimler AG*, however, reaffirmed that, under *Goodyear*, general jurisdiction might, "in an exceptional case," extend beyond a corporation's state of incorporation and principal place of business to a forum where "a corporation's

16

operations . . . *[are] so substantial and of such a nature as to render the corporation at home in that State.*"  *Daimler AG*, 134 S. Ct. at 761 n.19 (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952) (emphasis added)).  This is not that case.  The Diocese's scant contacts with Vermont do not come close.

*Perkins v. Benguet Consolidated Mining Company*, 342 U.S. 437 (1952), "remains [t]he textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum."  *Goodyear*, 131 S. Ct. at 2856 (internal quotation marks omitted).  In *Perkins*, the defendant, sued in Ohio, was a foreign Philippine mining corporation that had ceased all mining activities abroad.  342 U.S. at 447-48.  Its only business at the time of suit was done in Ohio, where its president maintained his office, kept the company files, and supervised the company.  *Id.*  Due process was satisfied because "Ohio was the corporation's principal, if temporary, place of business."  *Daimler AG*, 134 S. Ct. at 756 (internal quotation marks omitted).

By contrast, in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984), the defendant corporation had no place of business in the forum and was not licensed to do business there.  The Court concluded that "mere purchases [made in the forum State], even if occurring at regular intervals, are not enough to

17

warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at 418.

Similarly, in *Goodyear*, the defendants were overseas subsidiaries of an American corporation sued in North Carolina. They were not registered to do business in North Carolina, had no place of business, employees, or bank accounts there, and did not manufacture, design, sell, or advertise their products there; the only connection to the forum was that "a small percentage of [their] tires (tens of thousands out of tens of millions manufactured between 2004 and 2007) were distributed within North Carolina by other [parent company] affiliates." *Goodyear*, 131 S. Ct. at 2852. The Court held that defendants' "attenuated connections to the State f[e]ll short of the 'continuous and systematic general business contacts' necessary" to establish general jurisdiction. *Id.* at 2857 (quoting *Helicopteros*, 466 U.S. at 416) (internal citation omitted).

Most recently in *Daimler AG*, the plaintiffs sued Daimler, a German corporation, in California for its role in Argentina's "[d]irty [w]ar." 134 S. Ct. at 751. Daimler's U.S. subsidiary had contacts with California: three facilities, a regional office, and its status as the largest supplier of luxury vehicles to the California market (2.4% of Daimler's worldwide sales). *Id.* at 752. But even if

18

those contacts were imputable to Daimler, the German corporation was not "at home" in California. *Id*. at 760.

Measured against *Perkins*, *Helicopteros*, *Goodyear*, and *Daimler AG*, Vermont "is not a forum in which it would be permissible to subject [the Diocese] to general jurisdiction." *Goodyear*, 131 S. Ct. at 2857. Unlike the defendant in *Perkins*, whose sole business activity was conducted in the forum state, the Diocese has no office, files, or management in the forum. As in *Helicopteros* and *Goodyear*, the Diocese has no place of business or bank accounts in the forum. In fact, as the Diocese points out, the Diocese's limited contacts with Vermont[5] "suggest that a vanishingly small number of *Vermont residents* made contact with the *Diocese in New York*," not the other way around. Pet. 23 (emphasis in original). By contrast, in *Helicopteros*, the defendant contracted in, sent employees to, and used banks in the forum—yet was still not "at home" there. *See* 466 U.S. at 417-18.

Finally, there is no way to reconcile the district court's decision with *Daimler AG*. Daimler's contacts with the forum were far more substantial than the

---

[5] For example, its newspaper circulation to Vermont residents, the small number of philanthropic gifts made by Vermonters to the Diocese, the limited enrollment of Vermont children in Diocese schools, and the low membership rates of Vermonters in the Diocese's border parishes.

19

Diocese's with Vermont. Unlike Daimler, the Diocese operates no office or facility in Vermont, has no sales in the forum, and the percentage of its contacts with Vermont compared to its activities elsewhere (namely, New York) are trivial. Even imputing the border parishes' contacts with Vermont to the Diocese (which the district court declined to do) would not render the Diocese "at home" there. Considering, for general jurisdiction purposes, those parishes' employment of a small number of Vermont residents and service of a trivial number of Vermont parishioners again reverses the relevant inquiry—it is the Diocese's contacts with the forum, not the forum's residents' contacts with the Diocese in New York, that affect general jurisdiction. Moreover, those parishes' use of twenty-one Vermont vendors (which comprised less than 3.5% of their overall vendors) and acceptance of advertisements from eleven Vermont merchants for publication in church materials over a ten-year period is surely not enough.

Daimler, in contrast, was California's largest supplier of luxury vehicles, and operated offices and facilities in the forum. Morever, even at 2.4%, Daimler's percentage of worldwide sales conducted in the forum far surpasses the percentage of the Diocese's overall operations attributable to Vermont; yet, the

20

Court unanimously found jurisdiction lacking.  Simply put, if California is not

Daimler's home, Vermont is not "home" for the Diocese.

The district court's ruling rested in part on the occasional activities of the

Diocese's priests, and particularly Father Zelker.  But a weekly mass, even if to

some degree continuous and systematic, is not "so 'continuous and systematic' as

to render [the Diocese] essentially at home in the forum State."  *Goodyear*, 131 S.

Ct. at 2851.  As explained above, even had the district court imputed the six

border parishes' Vermont contacts to the Diocese, its jurisdictional determination

would not stand.[6]

If the Diocese is "at home" in Vermont, it begs the question: how many

homes might it have?  Would the Diocese be "at home" in New Jersey if one of its

hundreds of priests were to conduct a wedding or two in that State over a matter

of years?  Would circulation of *The Evangelist* to a Wyoming resident render the

Diocese "at home" there?  It is difficult to see where jurisdiction would end;

foreign-state and foreign-country corporations could be found "at home"

---

[6] For that reason, and because we have all relevant jurisdictional facts before us, it is unnecessary to remand to the district court for consideration of whether the border parishes' contacts should be imputed to the Diocese and whether, if imputed, the Diocese would be subject to general jurisdiction in Vermont.

essentially anywhere, based on the briefest and most trivial of contacts. The

Supreme Court explicitly rejected such an expansion of general jurisdiction in

*Daimler AG*:

> A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, "at home" would be synonymous with "doing business" tests framed before specific jurisdiction evolved in the United States. Nothing in *International Shoe* and its progeny suggests that "a particular quantum of local activity" should give a State authority over a "far larger quantum of . . . activity" having no connection to any in-state activity.

134 S. Ct. at 762 n.20 (citations omitted).

Accordingly, the Diocese's right to a writ of mandamus is "clear and

indisputable" because the District Court's exercise of general jurisdiction

amounted to a "clear abuse of discretion," if not a "judicial usurpation of power."

## Conclusion

Although a district court's denial of a motion to dismiss for want of

personal jurisdiction is ordinarily not appealable in the absence of a final

judgment or a § 1292(b) certification for interlocutory appeal, this is the

extraordinary case where mandamus relief is warranted. The individual aspects

22

that have contributed to our conclusion would, alone, be insufficient for the Diocese to demonstrate that the issuance of the writ of mandamus is appropriate. Taken together, however, (a) the irreparable harm caused by a needless foray into prior abuse investigations within the Diocese, exposing victims and their families to grueling inquiries that would not be undertaken in the absence of the district court's erroneous ruling, (b) the clarity of the district court's error and futility of remand, and (c) the opportunity in this case to shed light on the Supreme Court's most recent expressions on general jurisdiction, especially as applied to religious and other charitable organizations, constitute "exceptional circumstances" that warrant the issuance of the writ.  Accordingly, we **GRANT** the Diocese's petition for a writ of mandamus; **VACATE** the September 3, 2013 order of the district court; and instruct the district court to grant the Diocese's motion to dismiss the claims against it for lack of personal jurisdiction.