16-132-cv
United States v. Prevezon Holdings, Ltd.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: June 9, 2016                    Decided: October 17, 2016)

Docket No. 16-132-cv

_____

UNITED STATES OF AMERICA,

*Plaintiff-Petitioner*,

v.

PREVEZON HOLDINGS LTD., PREVEZON ALEXANDER, LLC,
PREVEZON SOHO USA, LLC, PREVEZON SEVEN USA, LLC,
PREVEZON PINE USA, LLC, PREVEZON 1711 USA, LLC,
PREVEZON 1810 LLC, PREVEZON 2009 USA, LLC, PREVEZON 2011 USA,
LLC,

*Defendant-Respondent*,

v.

HERMITAGE CAPITAL MANAGEMENT LTD.,

*Movant-Petitioner*.[1]

---

[1] The Clerk of the Court is respectfully directed to amend the caption as above.

_____

Before: POOLER, LOHIER, and CARNEY, *Circuit Judges*.

Appeal from United States District Court for the Southern District of New York (Thomas P. Griesa, *J*.) from the denial of Hermitage Capital Management Ltd.'s motion to disqualify counsel for Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810 LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC.

This case presents the "extraordinary circumstances" necessary to grant a writ of mandamus. We hold that the district court abused its discretion in denying the motion to disqualify. Accordingly, we grant the petition for a writ of mandamus and instruct the district court to enter an order disqualifying John Moscow and BakerHostetler LLP.

Writ granted.

_____

JACOB W. BUCHDAHL (Cory S. Buland, *on the brief*), Susman Godfrey LLP, New York, NY, *for Movant-Appellant Hermitage Capital Management Ltd*.

PAUL MONTELEONI, Assistant United States Attorney (Cristine Phillips, Margaret Garnett, Assistant United States Attorneys, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, *for Plaintiff-Appellee the United States of America.*

MICHAEL B. MUKASEY (Jennifer F. Mintz, Jarrod L. Schaeffer, *on the brief*), Debevoise & Plimpton, LLP, New York, NY, *for Defendants-Appellees Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810 LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC.*

POOLER, *Circuit Judge*:

Appeal from United States District Court for the Southern District of New York (Thomas P. Griesa, *J.*)[2] from the denial of Hermitage Capital Management Ltd.'s ("Hermitage") motion to disqualify counsel for Prevezon Holdings Ltd., Prevezon Alexander, LLC, Prevezon Soho USA, LLC, Prevezon Seven USA, LLC, Prevezon Pine USA, LLC, Prevezon 1711 USA, LLC, Prevezon 1810 LLC, Prevezon 2009 USA, LLC, and Prevezon 2011 USA, LLC (together, "Prevezon").

This case presents the "extraordinary circumstances" necessary to grant a writ of mandamus, as Hermitage is without other viable avenues for relief and

---

[2] On April 29, 2016, this case was reassigned to the Honorable William H. Pauley, III, United States District Court for the Southern District of New York.

3

the district court misapplied well-settled law. Accordingly, we grant the petition for a writ of mandamus and instruct the district court to enter an order disqualifying John Moscow and BakerHostetler LLP from representing Prevezon in this matter.

**BACKGROUND**

**I.     The underlying fraud.**

The underlying litigation arises out of a 2013 civil forfeiture action (the "Forfeiture Action") brought by the United States alleging that Prevezon received the proceeds of a complex, sweeping scheme that defrauded the Russian treasury of roughly $230 million (the "Russian Treasury Fraud"). The government alleges Prevezon laundered portions of the fraud proceeds in New York by buying various real estate holdings in Manhattan. We draw much of the background section from the second amended complaint, and note that the accuracy of the government's allegations remains untested.

Hermitage, an investment advisory firm, is a victim of the Russian Treasury Fraud. Hermitage advised the Hermitage Fund, an investment fund that focused on investments in Russia. A group of corrupt Russian officials and other individuals known as the "Organization" raided Hermitage's Moscow

office and the office of its Russian law firm in 2007. During the raid, the Organization stole corporate documents, including the official seals, of portfolio companies controlled by the Hermitage Fund. This practice is known in Russia as "reiderstvo," or corporate raiding. The Organization used the stolen documents to fraudulently transfer ownership of the portfolio companies to members of the Organization. The Organization then forged faked contracts with sham companies, creating the illusion that the portfolio companies owed nearly a billion dollars to the sham companies. The sham companies sued the portfolio companies. Lawyers purporting to represent the portfolio companies appeared in these actions and admitted the portfolio companies' full liability.

The fraudulent legal proceedings yielded judgments worth roughly $973 million for the Organization. The Organization then used the sham judgments to apply for tax refunds on behalf of the portfolio companies on the ground that the judgments represented losses that were equal to the profits reported by the portfolio companies in the previous tax year. Since the faked losses fully offset the profits, the portfolio companies were entitled to a refund of the taxes paid on those profits. Two days after the refund applications were filed, refunds of roughly $230 million were paid out by the Russian treasury to bank accounts

controlled by the Organization. A portion of that money was then wired to various accounts controlled by members of the Organization in banks around the world, requiring transfers of funds through the Southern District of New York. As part of the laundering process, the funds were deposited into different bank accounts in different countries multiple times. The government alleges that a portion of those monies (roughly $3 million) were transferred into accounts in Prevezon's name. Prevezon then purchased real estate in Manhattan using money that, at a minimum, was comingled with laundered proceeds from the Russian Treasury Fraud.

## II. Hermitage's involvement with BakerHostetler.

When Hermitage learned of the fraud, it hired attorneys in Russia to investigate, including Sergei Magnitsky. Magnitsky conducted an investigation that discovered the fraud, and Hermitage ultimately filed six criminal complaints with the Russian authorities. Hermitage and its lawyers instead found themselves the focus of the criminal investigation. After Russian authorities opened up a criminal case against two Hermitage lawyers who drafted several of the legal complaints, the lawyers fled Russia. Russian authorities also pursued criminal proceedings against Hermitage's chief

6

executive officer, William Browder, and other Hermitage employees and lawyers.

Magnitsky, who gave testimony against corrupt public officials alleged to be members of the Organization, was arrested in November 2008. After 358 days of pre-trial confinement, Magnitsky became ill and died. Russia's Human Rights Council determined that Magnitsky's arrest and detention were illegal, that on the last day of his life Magnitsky was beaten by guards wielding rubber batons, and that necessary medical care was withheld. The Public Oversight Commission for the City of Moscow for the Control of the Observance of Human Rights in Places of Forced Detention issued a report stating: "The members of the civic supervisory commission have reached the conclusion that Magnitsky had been experiencing both psychological and physical pressure in custody, and the conditions in some of the wards of [the prison] can be justifiably called torturous."[3]

---

[3] In December 2012, a new law went into effect in the United States. The Sergei Magnitsky Rule of Law Accountability Act imposes sanctions on those responsible for Magnitsky's detention, abuse, and death. Pub. L. No. 112–208, 126 Stat. 1496.The defendants here are not alleged to have participated in Magnitsky's detention, abuse or death, but members of the Organization are, either directly, or by helping others avoid liability for their actions, or by financially benefiting from his detention, abuse, or death.

In September 2008, Hermitage hired attorney John Moscow of BakerHostetler "[t]o help gather evidence for them to defend [Hermitage] in Russia," App'x at 192, and to try to interest the United States government in investigating the fraud and reclaiming the fraud's proceeds. BakerHostetler's retention letter described the scope of its representation:

> In this engagement, we expect to perform the following: extensive analysis of the factual and legal background of the events in question; examination and analysis of evidence in both testimonial and documentary form, including the testimony of expert witnesses; preparation and presentation of prosecution memoranda, if appropriate, to the United States Department of Justice (or other law enforcement agency); and cooperation and support to the United States Department of Justice if an investigation is pursued by them.

App'x at 107.

BakerHostetler and Moscow represented Hermitage for roughly nine months. During that time, Moscow and his colleagues reviewed non-public documents from Hermitage related to the Russian Treasury Fraud, which allowed the firm to create a case timeline and chronology, and discussed "potential individuals for depositions in connection with the prosecutions in Russia." App'x at 116. Moscow met with staff at the U.S. Attorney's Office for the

8

Southern District of New York, including a lengthy meeting on December 3, 2008 with former Assistant U.S. Attorney Marcus Asner, and with the office of the Attorney General in the British Virgin Islands. The firm also "review[ed] bank records" and researched a "proper service agent for" a bank involved in routing proceeds of the Russian Treasury Fraud.

BakerHostetler also drafted a twenty-five page declaration in anticipation of Hermitage seeking a Section 1782 subpoena, which allows a federal court to order discovery in the United States "for use in a . . . foreign . . . tribunal," 28 U.S.C. § 1782(a). The draft declaration, never before used in any court proceedings and filed here under seal, details the Russian Treasury Fraud in a manner that closely tracks the allegations of the civil forfeiture complaint ultimately filed by the government. The draft declaration and complaint also both describe the "Rengaz" or "Renaissance" fraud, a 2006 tax refund fraud undertaken by the same criminal organization. That fraud involved subsidiaries of Rengaz Holdings, an investment fund associated with Renaissance Capital. The draft declaration and complaint allege that the same modus operandi was used to perpetrate the Russian Treasury Fraud and the Rengaz fraud, such that

9

the government plans to introduce evidence at trial connecting the Rengaz fraud and the Russian Treasury Fraud.

Hermitage paid BakerHostetler and Moscow nearly $200,000 in fees. Hermitage terminated the relationship after roughly nine months and retained new counsel. Its new counsel continued the investigation into tracing the proceeds of the alleged Russian Treasury Fraud and provided its results to the United States government. The government, in turn, conducted its own investigation which led to it filing a civil forfeiture and money laundering action against Prevezon in September 2013. Prevezon hired Moscow and BakerHostetler to defend it against the government's charges.

Hermitage filed a complaint with the Southern District of New York's Grievance Committee against Moscow and BakerHostetler, protesting Moscow and BakerHostetler's representation of Prevezon in light of their prior representation of Hermitage. On August 7, 2014, the Grievance Committee notified Hermitage it would take no action in the matter, without prejudice to Hermitage pursuing the issue in district court. On September 29, 2014, Hermitage moved for BakerHostetler's disqualification, on the ground that BakerHostetler and Moscow "switched sides" by first pursuing the perpetrators

of the Russian Treasury Fraud as counsel for Hermitage and then defending those accused of committing the same fraud. BakerHostetler opposed the motion, arguing that its representation was not adverse to Hermitage because both Hermitage and Prevezon were innocent of any wrongdoing. When Hermitage raised the possibility that BakerHostetler would defend Prevezon by arguing that Hermitage committed the Russian Treasury Fraud, the district court commented that it "seem[ed] . . . very, very speculative" and BakerHostetler's counsel called the allegation "simply untrue." App'x at 175-76. The district court denied the motion, explaining that "[t]here is no indication that [Moscow] is in any substantial way taking a position which involves an attack upon or an attempt to hold liability with regard to Hermitage." App'x at 297.

Following the close of discovery, the government moved for partial summary judgment against Prevezon, seeking to establish that (1) the Russian Treasury Fraud took place and (2) it qualified as a "specified unlawful activity" to establish liability under federal law.[4] In opposing the motion, Prevezon argued

---

[4] To make out its case for money laundering, the government must prove the transactions at issue involved the proceeds of a "specified unlawful activity" as defined in 18 U.S.C. §§ 1956(a)(1), 1957(a). The government alleges that the "specified unlawful activity" is the Russian Treasury Fraud. The government also asserts it constitutes foreign bank fraud under 18 U.S.C. § 1956(c)(7)(B)(iii). The government also alleges that transfers of the proceeds of the Russian

11

that "[t]he manner in which the [Russian] Treasury Fraud was carried out . . . is an essential element of the Government's claims." App'x at 445-46. While it previously argued that the Russian Treasury Fraud was "irrelevant" to its defense, App'x at 221, Prevezon now argued that:

> The version of the fraud on the Russian Treasury (the "Treasury Fraud") told in the first, second and third complaints has been exposed by discovery to be false. It was contrived and skillfully sold by William F. Browder to politicians here and abroad to thwart his arrest for a tax fraud conviction in Russia. This public relations narrative was swallowed whole by the Government, which incorporated it into its complaint without investigation, a situation this Court has described as "troubling." When placed under oath, however, Browder's own witnesses revealed that he authorized the supposedly unauthorized acts alleged in the three complaints and knew about the events that the complaints allege he was unaware of. From this discovery, it is plausible Browder stole the money from the Russian Treasury or, at least, knew about the fraud before it occurred. . . . This case is about fraud on the Russian Treasury; it is not about fraud on an investor or trustee of Browder's Hermitage Fund. Shortening the trial by relieving the Government of its obligation to prove a Specified Unlawful Activity would deprive Defendants of an important, meritorious defense.

---

Treasury Fraud through the United States constitute transportation of stolen property in violation of 18 U.S.C. § 2314, and that earlier instances of money laundering served as predicate offenses for later money laundering transactions.

App'x at 445-46. Prevezon further argued the record demonstrated that "Browder and his agents engaged in a series of misrepresentations to execute the fraud, to distance themselves from it, and to pin it on the Russian officials investigating Browder for a separate tax fraud his companies committed." App'x at 449. At oral argument on the motion, Prevezon's counsel stated: "[W]hat it comes down to, Judge, is, the government alleges there was an organization, unnamed, mysterious organization that did all this, and the evidence points that Hermitage and Mr. Browder did it. That is the heart of the dispute." App'x at 516.

The district court denied the partial summary judgment motion, explaining that:

> In my view the government's motion for partial
> summary judgment presents some points that are very
> well taken. In other words, there are certain things that
> are not in dispute. There are a lot of things that are hotly
> in dispute. But some things are not in dispute. And I
> keep referring and I'll refer to it again: the basic fraud in
> Moscow is not in dispute. It was committed. And $216
> million was stolen from Russia. That is not in dispute.
>
> Now, the problem is, in trying to eliminate issues by
> granting partial summary judgment, the problem with
> that is, it isn't that the government's motion is not well
> taken, but it seems to me at the trial it will be necessary
> to put on evidence of that background. I cannot see a

trial that does not start with the basic evidence about what occurred in Moscow.

App'x at 517-18.

With the litigation headed for trial, on December 15, 2015, Hermitage again sought BakerHostetler's disqualification. The district court granted the motion on December 18, 2015, without allowing Prevezon an opportunity to brief the issue, stating that:

It is now clear that one of BakerHostetler's primary defense strategies in the present case involves asserting that Hermitage had substantial responsibility for what is well known as the Russian Treasury Fraud. This is significant because the level of Hermitage's involvement in fraudulent activity may make the difference between proving or not proving the commission of certain alleged specified unlawful activities as a foundation for showing money laundering, which is at the heart of the present case. Hermitage's involvement was not previously at issue. Indeed, Moscow, who formerly represented Hermitage, took the position that Hermitage had "nothing to do" with the Russian Treasury Fraud. The case has now changed, in that it appears that BakerHostetler, and thus Moscow, is asserting that "the evidence points that Hermitage" was substantially involved in the Russian Treasury Fraud.

BakerHostetler's change in defense strategy now makes the subjects of its former and current representation "substantially related." There is now a very real possibility that BakerHostetler will be in a position

14

where it would be trying to show that its current clients (the Prevezon defendants) are not liable and showing this by attacking its former client (Hermitage) on the very subject of BakerHostetler's representation of that former client.

Special App'x at 1-2 (internal citations omitted).

On December 21, 2015, Prevezon moved to certify an interlocutory appeal of the disqualification order pursuant to 28 U.S.C. § 1292(b), and for a stay of the district court proceedings pending appeal. The district court granted the motion in its entirety the next day, before the government or Hermitage responded. When the government objected, the district court sua sponte withdrew the disqualification order, explaining that it erred in entering the order without briefing by Prevezon and directing Prevezon to brief the issue.

Prevezon filed a brief opposing the disqualification motion. Hermitage filed a reply brief and a supporting declaration from Bruce A. Green, a legal ethics professor at Fordham University School of Law, who opined that disqualification was proper. The government filed a brief advocating disqualification, highlighting the risk of retaliation against Hermitage-related individuals from Russian authorities. The government noted that Browder, after being barred from Russia, was prosecuted in absentia by Russia on charges of a

separate Hermitage-related tax fraud, and that Interpol declined to assist Russia because the proceedings were "predominantly political in nature." App'x at 603. In addition, the Prosecutor General of Russia issued an open letter accusing Browder of committing the Russian Treasury Fraud, along with other crimes, and threatening further prosecution.

On January 8, 2016, the district court reversed its decision and denied Hermitage's motion for disqualification, concluding that "Moscow's representation of Prevezon does not pose a significant risk of trial taint." *United States v. Prevezon Holdings Ltd.*, No. 13-cv-06326, 2016 WL 96170, at *1 (S.D.N.Y. Jan. 8, 2016). The district court determined that there was no "substantial relationship" between the subject matter of the two representations  because the Russian Treasury Fraud was "merely background information." *Id.* at *4. The district court explained:

> As an initial matter, it is important to clarify what this case is not about. This case is not about Hermitage, nor is this case centrally focused on the Russian Fraud. Even if it were, to the court's knowledge, Hermitage was never the target of a U.S. investigation for the Russian Fraud, let alone an actual lawsuit. In this way, Moscow did not "switch sides," nor is he now accusing a former client of the "same crime" that he was "retained to defend against."

> Moreover, the Russian Fraud is an ancillary issue in this suit. The Government does not allege that Prevezon committed the Russian Fraud. Rather, the Government has accused Prevezon of laundering proceeds of the Russian Fraud through the United States. The Russian Fraud is merely background information and Hermitage cannot be held liable as a result of this lawsuit.
>
> Not only is the Russian Fraud a side issue in this matter, but Hermitage is also a mere spectator to this litigation. Hermitage is not a party to this suit and its rights are not directly at stake. Though Hermitage may be interested in the outcome of the case and in how its name is used at trial, these concerns do [not] warrant the drastic relief they seek.

*Id*. at *4-5. Although the district court acknowledged the risk of legal action against Hermitage and its officers by Russian authorities, it deemed that risk both speculative and irrelevant to its consideration of the disqualification motion because Hermitage was not a party to the instant litigation, and thus the district court saw no risk of "potential taint to this trial." *Id.* at *5.

Hermitage moved for a stay and sought to certify an interlocutory appeal on January 11, 2016. The district court denied the motion on January 15, 2016. With the government's support, Hermitage then moved in this Court for a stay pending appeal, or, in the alternative, a petition for a writ of mandamus. This Court granted the stay motion on January 25, 2016.

17

**DISCUSSION**

**I. Collateral order doctrine.**

We start, as we must, with the threshold question of subject matter jurisdiction. Generally, "[t]he courts of appeals . . . have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ." 28 U.S.C. § 1291. There are, however, a few "safety valves" that allow an appellate court to "promptly correct[] serious errors." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009). One such safety valve is certification, which allows a district court to certify an appeal pursuant to 28 U.S.C. § 1292(b) when it is "of the opinion that [the relevant] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Where, as here, certification is sought and denied, there are two remaining safety valves: (1) an appellant may establish jurisdiction by demonstrating that its appeal falls within the collateral order exception to the final judgment rule, or (2) an appellant may petition for a writ of mandamus.

Hermitage first argues that this appeal falls under the collateral order doctrine, which allows interlocutory appeals from a "small class" of district court

18

orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Collateral orders are those that "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) (footnote and citations omitted).

While in this case "the possibility of reconsideration by the trial judge cannot be dismissed as theoretical," *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 381 (1981) (Rehnquist, *J.*, concurring), we need not decide whether a disqualification motion satisfies the "conclusive determination" requirement. Nor need we consider whether Hermitage's status as a nonparty renders the order at issue "effectively unreviewable." Instead, we find that the collateral order doctrine does not apply here because the denial of a disqualification order does not resolve an "important issue completely separate from the merits." *Id.* at 375.

19

The *Firestone* Court assumed, without deciding the issue, that the disqualification question resolved an important issue separate from the merits. *Id.* at 376. But in *Richardson-Merrell, Inc. v. Koller*, the Supreme Court held that "orders disqualifying counsel in civil cases are not completely separate from the merits of the action." 472 U.S. 424, 439 (1985) (internal quotation marks and citation omitted). In *Richardson-Merrell* the Court noted it "has expressly rejected efforts to reduce the finality requirement of § 1291 to a case-by-case determination of whether a particular ruling should be subject to appeal." *Id.* (citation omitted). It concluded that "[e]ven if some orders disqualifying counsel are separable from the merits of the litigation, many are not." *Id.* (noting that "[o]rders disqualifying attorneys on the ground that they should testify at trial, for example, are inextricable from the merits because they involve an assessment of the likely course of the trial and the effect of the attorney's testimony on the judgment.") (citation omitted). This reasoning applies equally to orders denying the disqualification of counsel, and we adopt it here.

The final judgment rule "serves the important purpose of promoting efficient judicial administration," *Firestone*, 449 U.S. at 374, and avoids "unreasonable disruption, delay, and expense" caused by multiple interlocutory

20

appeals. *Richardson-Merrell*, 472 U.S. at 430. As we have cautioned, "[t]he class of collateral orders as to which interlocutory review is permitted under § 1291 must remain narrow and selective in its membership, so that the collateral order doctrine does not overpower the substantial finality interests that § 1291 is meant to further." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 103 (2d Cir. 2013) (internal quotation marks and citation omitted).

**II.     Mandamus.**

We turn to Hermitage's alternate request for relief: that if we find the collateral order doctrine does not apply, we treat its appeal as a petition for a writ of mandamus. *See SEC v. Rajaratnam*, 622 F.3d 159, 169 (2d Cir. 2010) ("Even though we lack interlocutory jurisdiction to review the district court's order, a writ of mandamus may still be appropriate."). The *Firestone* Court noted that mandamus may be appropriate in "situations in which a party will be irreparably damaged if forced to wait until final resolution of the underlying litigation before securing review of an order denying its motion to disqualify opposing counsel." *Firestone*, 449 U.S. at 378 n.13. Indeed, our sister Circuits will issue writs of mandamus to direct a district court both to disqualify counsel and to allow counsel to proceed. *See, e.g., Matter of Sandahl*, 980 F.2d 1118, 1122 (7th

Cir. 1992) (granting writ and directing district court to vacate disqualification order); *In re Am. Airlines, Inc.*, 972 F.2d 605, 609 (5th Cir. 1992) ("American claims that immediate review of its disqualification motion is appropriate. . . . We agree."); *Christensen v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 844 F.2d 694, 697 (9th Cir. 1988) (noting that the effect of an order disqualifying counsel "is irreversible"); *In re Am. Cable Publ'ns, Inc.*, 768 F.2d 1194, 1197 (10th Cir. 1985) (granting writ and directing district court to vacate disqualification order).

The All Writs Act provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Act empowers this Court to issue a writ of mandamus directing a district court to correct an erroneous order. *Linde*, 706 F.3d at 107. "[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)(citation omitted). "[O]nly exceptional circumstances amounting to a judicial usurpation of power, or a clear abuse of discretion, will justify the invocation of this extraordinary remedy." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (internal quotation marks and citations omitted).

To obtain a writ of mandamus: "(1) the party seeking issuance of the writ must have no other adequate means to attain the relief it desires; (2) the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances; and (3) the petitioner must demonstrate that the right to issuance of the writ is clear and indisputable." *In re The City of New York*, 607 F.3d 923, 932-33 (2d Cir. 2010) (internal quotation marks and citations omitted). Our Court issues a writ "only in exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion." *Id.* at 943 (internal quotation marks, emphasis and citation omitted). "A district court abuses its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if it has rendered a decision that cannot be located within the range of permissible decisions. We will issue the writ only if a district court committed a clear and indisputable abuse of its discretion in one of these ways." *Rajaratnam*, 622 F.3d at 171 (internal quotation marks and citations omitted).

All three requirements are satisfied here. Hermitage lacks an adequate alternate means to obtain relief, the issue involved is significant and will aid in the administration of justice, and the district court committed clear error in

23

analyzing the substantial relationship between the two representations. We discuss each in turn.

**A.  Adequate means of obtaining relief.**

Even assuming arguendo Hermitage possesses standing to challenge the denial in a post-trial appeal, such a challenge would come too late to provide any effective relief. Unlike a party, Hermitage cannot escape the harm of allowing its former counsel to represent Prevezon by moving to vacate a final judgment. Prevezon's trial strategy calls for it to demonstrate "that Browder and his agents engaged in a series of misrepresentations to execute the fraud, to distance themselves from it, and to pin it on the Russian officials investigating Browder for a separate tax fraud his companies committed." App'x at 449. Absent disqualification, there is a real risk of Hermitage's confidences being misused. "As Judge Kearse has succinctly explained, 'a remedy after final judgment cannot unsay the confidential information that has been revealed.'" *City of New York*, 607 F.3d at 934 (quoting *In re Sims*, 534 F.3d 117, 129 (2d Cir. 2008)). Indeed, "the concern that a remedy after final judgment cannot unsay the confidential information that has been revealed may account for the liberal use of mandamus in situations involving the production of documents or testimony claimed to be

24

privileged or covered by other more general interests in secrecy." *In re von Bulow*, 828 F.2d 94, 99 (2d Cir. 1987) (citations omitted); s*ee also Unified Sewerage Agency of Wash. Cnty., Or. v. Jelco Inc.*, 646 F.2d 1339, 1344 (9th Cir. 1981) ("[Petitioner] could suffer irremediable damage if forced to wait until after trial to appeal. . . . Information once used or exposed would not be forgotten and could be used against [petitioner] on retrial."). Finally, an appeal after final judgment will provide no useful remedy if the confidences revealed provide grist for the Russian authorities pursuing Browder and Hermitage.

Prevezon argues that there are other tools available to provide Hermitage with relief against the potential misuse of its confidences, such as a protective order. But protective orders are inadequate where, as here, the concern is not simply the disclosure of confidential information but the use of that information in shaping trial strategy and questioning. *Ullrich v. Hearst Corp.*, 809 F. Supp. 229, 236 (S.D.N.Y. 1992) ("Adverse use of confidential information is not limited to disclosure. It includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject, and innumerable other uses."). The danger here is not limited to BakerHostetler

25

overtly using confidences in the litigation. There is a risk that BakerHostetler, while not explicitly using confidences, may use such confidences to guide its defense of Prevezon in other ways. A district court order to prevent such conduct is unworkable.

**B.    Appropriate under the circumstances.**

The writ is appropriate in the circumstances of this case, because this case implicates a significant and novel question of law regarding the rights of nonparty clients, and because resolving that issue will aid in the administration of justice. *City of New York*, 607 F.3d at 942-43. We confront a question of first impression in this Circuit: disqualification of counsel on the basis of a conflict of interest posing a potential harm to a nonparty non-witness. Addressing this unusual set of circumstances will offer useful guidance to the district courts.

Further, as discussed in detail below, the district court committed clear error in its analysis of the substantial relationship between the representations. The preservation of the confidences between lawyer and client  "touch[es] upon vital concerns of the legal profession and the public's interest in the scrupulous administration of justice." *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 564 (2d Cir. 1973). A client cannot fully and candidly discuss its situation with counsel if

26

the client must worry that such confidences could be used to implicate him in the very crimes for which he hired that attorney to defend him, significantly undermining the lawyer-client relationship. *See In re von Bulow*, 828 F.2d at 99 ("[B]ecause maintenance of the attorney-client privilege up to its proper limits has substantial importance to the administration of justice, and because an appeal after disclosure of the privileged communication is an inadequate remedy, the extraordinary remedy of mandamus is appropriate."(internal quotation marks and citation omitted)); *see also In re Am. Airlines*, 972 F.2d at 619 ("This court bars attorneys from appearing in substantially related matters not only to protect individual parties against the adverse use of information but also to aid the frank exchange between attorney and client."(internal quotation marks and citation omitted)). This duty is ongoing, such that an attorney must preserve a client's confidences even after the attorney-client relationship ends. *See, e.g., Bd. of Ed. of City of N.Y. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).

The petition here also implicates the government's ability to procure assistance from crime victims. If crime victims fear that the attorneys they hire may turn against them, they may be less likely to assist government in its investigations. *See, e.g., City of New York*, 607 F.3d at 942 ("If we were to decline to

27

grant this petition, we would risk discouraging law enforcement agencies from conducting undercover investigations."); *United States v. Alex*, 788 F. Supp. 359, 365 (N.D. Ill. 1992) ("By switching sides during a pending investigation, [the disqualified attorney's] conduct challenges the very integrity of our adversary system. In addition, such actions might very well have a chilling effect on obtaining victims' assistance in prosecuting organized crime."). Allowing the former counsel for Hermitage, identified by the government as a victim of the Russian Treasury Fraud, to represent Prevezon, a putative participant in the alleged crime, creates a potential for harm to future government investigations.

**C.     "Clear and Indisputable" Right to the Writ.**

**i.     Substantial relationship.**

The classic test in this Circuit for whether disqualification is warranted in successive representation cases is set forth in *Evans v. Artek Sys. Corp*: disqualification is warranted where: "(1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is

28

sought had access to, or was likely to have had access to, the relevant privileged information in the course of his prior representation of the client." 715 F.2d 788, 791 (2d Cir. 1983); *accord* N.Y. Rules of Prof'l Conduct 1.9(a).

"A 'substantial relationship' exists where facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation." *Agilent Techs., Inc. v. Micromuse, Inc.*, No. 04-cv-3090, 2004 WL 2346152, at *10 (S.D.N.Y. Oct. 19, 2004) (citation omitted); *see also* N.Y. Rules of Prof 'l Conduct 1.9 cmt. 3 (subsequent representations are substantially related if, among other things, they "involve the same transaction"). The district court found the two representations here were not substantially related because (1) "[t]his case is not about Hermitage, nor is this case centrally focused on the Russian Fraud," (2) the "Russian Fraud is merely background information and Hermitage cannot be held liable as a result of this lawsuit," and (3) "Hermitage is [] a mere spectator in this litigation . . . and its rights are not directly at stake." *Prevezon*, 2016 WL 96170, at *4-*5.

We disagree. The district court's statement that the Russian Treasury Fraud is an "ancillary issue in this suit" cannot be reconciled with Prevezon's own representation that "[t]he manner in which the Treasury Fraud was carried

out . . . is an essential element of the Government's claims." App'x at 445.

Prevezon argued before the district court that granting the government's motion for partial summary judgment on the issue of whether the Russian Treasury Fraud took place would "deprive Defendants of an important, meritorious defense," namely, establishing that Hermitage, not Prevezon, committed the fraud. App'x at 446.

Prevezon states that at trial, it intends to introduce evidence that Hermitage's "Browder and his agents engaged in a series of misrepresentations to execute the fraud, to distance themselves from it, and to pin it on the Russian officials investigating Browder for a separate tax fraud his companies committed." App'x at 449. Prevezon told the district court that "every step of the alleged fraud . . . has been disputed with very specific facts. And what it comes down to, Judge, is, the government alleges there was an organization, unnamed, mysterious organization that did all this, and the evidence points that Hermitage and Mr. Browder did it. That is the heart of the dispute." App'x at 516. Plainly, Prevezon's trial strategy turns on proving Hermitage is not the victim of the Russian Treasury Fraud, but the perpetrator.

Moreover, the record makes clear that BakerHostetler's prior

representation of Hermitage included investigating the Russian Treasury Fraud. The draft declaration prepared by BakerHostetler discusses how Hermitage's assets were stolen as a result of the Russian Treasury Fraud, and details the retaliation against Hermitage and its attorneys for reporting the crime to Russian authorities. At oral argument, the district court asked Moscow, "In other words, what you were doing back in 2008 and early 2009 for Hermitage was to get bank records and other records to defend [Hermitage] in the event there was a Russian prosecution for them stealing, right?" App'x at 201-202. Moscow replied, "[c]orrect." App'x at 202. We are persuaded that both representations involve the same facts and circumstances.

The district court also erred in determining that "Hermitage is [] a mere spectator to this litigation. . . . and its rights are not directly at stake." *Prevezon*, 2016 WL 96170, at *5. Hermitage is not a "mere spectator." It is the putative victim. The courts recognize that crime victims, as well as witnesses, possess legitimate interests in criminal proceedings that may support disqualification. In *United States v. James*, we upheld the disqualification of a defense attorney who previously represented a witness scheduled to testify for the government in a criminal trial. 708 F.2d 40 (2d Cir. 1983). The *James* court noted that "[t]he

31

assessment of the fairness of an attorney's questioning of a former client must depend in large part on the view of the client," *id.* at 46, and that disqualification can be appropriate to protect the witness's interests. *Id.* at 45-46. For these purposes, we see no reason why a nonparty victim is not entitled to the same solicitude as a nonparty witness.

### ii. Confidences.

Once a substantial relationship between the cases is established, "where the same individual lawyer participated in the prior and current representation, the movant is not required to make a specific showing that confidences were passed to counsel. Instead, the movant is entitled to the benefit of an irrebuttable presumption that confidences were shared." *DeFazio v. Wallis*, 459 F. Supp. 2d 159, 164-65 (E.D.N.Y. 2006) (collecting cases). As our Court explained in *Gov't of India v. Cook Indus., Inc.*:

> In order to grant a disqualification motion, a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case. Such a requirement would put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether.

32

569 F.2d 737, 740 (2d Cir. 1978).

The district court erred in shifting the burden to Hermitage to identify confidences it had shared with its counsel. The district court faulted Hermitage for failing to "concretely show[] that any of its confidences had anything to do with how, why, or when Prevezon allegedly laundered Russian Fraud proceeds into the United States, or how its confidences would be relevant in the case against Prevezon, in which the Russian Fraud is mere background." *Prevezon*, 2016 WL 96170, at *5. The substantial relationship test removes the need for courts to make direct inquiry into whether confidential information was actually transmitted. *See U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1461 (S.D.N.Y. 1985). After finding a substantial relationship exists:

> The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

*Emle*, 478 F.2d at 570 (quoting *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 268-69 (S.D.N.Y. 1953)).

33

Prevezon argues the presumption of access to privileged communications

is inapplicable here because the record indicates Hermitage did not share any

relevant confidences, and because Hermitage waived confidentiality by sharing

its information with the government. But, in our view, these arguments merely

ask us to "inquire into the[] nature and extent" of confidences. *See Emle*, 478 F.3d

at 570. We decline to do so. *Id.*

### iii. Trial taint.

"The authority of federal courts to disqualify attorneys derives from their

inherent power to preserve the integrity of the adversary process." *Hempstead*

*Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (internal

quotation marks and citation omitted). In exercising this power, the Court must

"be solicitous of a client's right freely to choose his counsel—a right which of

course must be balanced against the need to maintain the highest standards of

the profession." *Gov't of India,* 569 F.2d at 739. Thus, disqualification is called for

only where "an attorney's conduct tends to taint the underlying trial," because

federal and state disciplinary mechanisms suffice for other ethical violations.

*Nyquist,* 590 F.2d at 1246.

Generally, where, as here, the *Evans* factors are satisfied, trial taint is

34

established and no further analysis is necessary. *Hempstead Video*, 409 F.3d at 133.

Even if the *Evans* factors were not satisfied, however, we would find the record supports a finding of disqualifying taint. "One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client." *Id.* Prevezon's proposed defense strategy of proving Hermitage committed the Russian Treasury Fraud plainly places its counsel "in a position where he could use [Hermitage's] privileged information against [Hermitage]." *Id.*

The Eighth Circuit found disqualification proper in circumstances similar to those here in *Zerger & Mauer LLP v. City of Greenwood*. 751 F.3d 928, 929-30 (8th Cir. 2014). There, a law firm represented the City of Greenwood in a case against a local quarry. *Id.* In settlement negotiations, Greenwood agreed to route truck traffic along a specific road and stipulated that the traffic would not create a nuisance. *Id.* Greenwood's lawyers later sued the same quarry on behalf of a number of property owners along the truck route who argued it was a nuisance. While Greenwood was not a party, the Eighth Circuit found such representation improper and ordered disqualification:

> Not only do plaintiffs have an interest in collecting

35

> substantial damages, they also naturally have an interest in otherwise disrupting [the quarry's] use of Second Avenue, even if they have not sought an injunction. . . . . Greenwood may demand that its former counsel not advocate positions that pose the serious threat of once again embroiling Greenwood in protracted litigation.

*Id.* at 934 (footnote omitted). In a similar vein, courts will disqualify lawyers who switch sides from representing a crime victim to representing the perpetrator.

*See, e.g., United States v. Gordon*, 334 F. Supp. 2d 581, 597 (D. Del. 2004); *United States v. Fawell*, No. 02 CR 210, 2002 WL 1284388, at *7-*8, *11 (N.D. Ill. June 10, 2002); *United States v. Alex*, 788 F. Supp. 359, 365 (N.D. Ill. 1992). Because Prevezon's defense is predicated on proving Hermitage committed the Russian Treasury Fraud, this is a situation where "an attorney's conduct tends to taint the underlying trial." *Nyquist*, 590 F.2d at 1246 (internal quotation marks and citation omitted).

**CONCLUSION**

In granting the petition, we are sensitive to the fact that the motion to disqualify came late in the litigation, on the eve of trial after several years of pre-trial discovery and motion practice and while several million dollars of property remains under pretrial restraint. However, Prevezon shares in the responsibility

36

for the unfortunate timing, as Prevezon did not reveal its strategy of arguing Hermitage committed the Russian Treasury Fraud until the government moved for partial summary judgment in the fall of 2015.

The circumstances leading to our grant of the writ, moreover, truly are extraordinary: it is rare that a nonparty, nonwitness will face the risk of prosecution by a foreign government based on the potential disclosure of confidential information obtained during a prior representation. That real risk, however, coupled with the misapplication of the law by the district court, outweighs the delay and inconvenience to Prevezon of obtaining new counsel.

We have examined the remainder of the arguments raised by the parties and find them to be without merit. For the reasons given above, we grant the petition for a writ of mandamus and instruct the district court to enter an order disqualifying Moscow and BakerHostetler from representing Prevezon in this litigation. Prevezon's motion for clarification, filed in this Court on February 17, 2016, is denied as moot.